UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CRAIG GAETANI, | |
| Plaintiff, | |
| v. | Civil Action No. 14-30057-MGM |
| DAVID J. HADLEY, | |
| Defendant. | |

MEMORANDUM AND ORDER REGARDING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT AND MOTION TO STRIKE
(Dkt. Nos. 111 & 116)

March 29, 2019

MASTROIANNI, U.S.D.J.

## I.     INTRODUCTION

Plaintiff Craig Gaetani ("Plaintiff") alleges Defendant David Hadley ("Defendant" or "Hadley"), a court security officer, wrongfully and unreasonably removed him from a Berkshire County courtroom where he sought clarification from a judge. Plaintiff originally asserted nine claims under state and federal law against Defendant; Susan McMahon ("McMahon"), another court security officer; the Commonwealth of Massachusetts; and "the Trial Court of the Commonwealth." (Dkt. No. 1.) The court partially granted several motions to dismiss (Dkt. Nos. 28 & 53), and Plaintiff voluntarily dismissed his claims against McMahon (Dkt. No. 109). Hadley is the only remaining defendant. Plaintiff's remaining claims against Hadley are (1) a claim under 42 U.S.C. § 1983 for a violation of Plaintiff's Fourth Amendment right to be free from unreasonable seizures (Count III); (2) a related claim under the Massachusetts Civil Rights Act ("MCRA"), MASS. GEN. LAWS c. 12, §§ 11H & 11I (Count IV); and (3) a common law assault and battery claim (Count V).

Hadley moved for summary judgment on all claims[1] or, in the alternative, asserting he is entitled to qualified immunity on all claims. (Dkt. No. 111.) Hadley also seeks reconsideration of the court's denial of his motion to dismiss Plaintiff's MCRA claim. The court heard argument on the summary judgment motion on May 9, 2018. For the reasons below, Hadley's summary judgment motion will be granted as to Plaintiff's MCRA claim and otherwise denied.

Hadley also moved to strike an expert opinion from Plaintiff's opposition to the summary judgment motion. (Dkt. No. 116.) After the hearing on the summary judgment motion, the parties filed a joint statement regarding the motion to strike, in which they agreed that if Defendant prevailed on his summary judgment motion, the motion to strike would be moot. (Dkt. No. 119.) In lieu of filing a formal opposition to the motion to strike, Plaintiff raised his objections to that motion in the joint statement. For the reasons set forth in Section V below, Defendant's motion to strike will be allowed in part and denied in part.

## II.    FACTUAL BACKGROUND

The undisputed facts are few and, in relevant part, are as follows. On June 22, 2011, Plaintiff appeared at the Pittsfield District Courthouse to attend proceedings in a civil action he initiated in pursuit of money owed to him. The defendant in that case was incarcerated on unrelated charges and did not appear. The presiding judge directed Plaintiff to visit the clerk's office to obtain a writ of *habeas corpus* directing the defendant's attendance at the next proceeding. Shortly after Plaintiff departed, McMahon, who had been on duty in the courtroom when Plaintiff received the judge's

---

[1] This is Hadley's renewed motion for summary judgment. He (and McMahon, when she was still a party to this case) initially moved for summary judgment in February of 2017. (Dkt. No. 75.) The court subsequently administratively stayed the case due to Plaintiff's counsel's health concerns (Dkt. No. 101) and dismissed the initial summary judgment motion without prejudice and subject to refiling after the stay was lifted (Dkt. No. 102). The stay was lifted on March 1, 2018 (Dkt. No. 107), Plaintiff voluntarily dismissed McMahon a few days later (Dkt. No. 109), and Hadley then filed this renewed motion (Dkt. No. 111).

instruction to request a *habeas* from the clerk's office, responded to a request for help with a disturbance at the clerk's office. Witness accounts differ at this point and are summarized below.

## A. Defendant's and Other Court Officers' Version of Events

According to McMahon, she hurried to the clerk's office and found Plaintiff "yelling and screaming at the woman behind the counter and leaning over the counter." (McMahon Dep. Tr. (Dkt. No. 77-1, Ex. 4) at 35:20-22.) Plaintiff was "very irate," but McMahon "couldn't even really get the gist of what the problem was." (*Id.* at 26:1-3.) She asked Plaintiff to calm down, but his behavior continued as clerk's office personnel tried to reason with him. (*Id.* at 36:13-37:11.) Despite her "polite[]" and "calm[]" requests, Plaintiff continued to "yell and scream." (*Id.* at 37:9-13.) Concerned the commotion would disrupt nearby court proceedings, McMahon told Plaintiff he "need[ed] to leave this office now. You're disrupting the court." (*Id.* at 37:12-23.) "At some point," Plaintiff left the clerk's office but started to scream; he "barged" out the door, declaring he would "go see the judge myself, right now." (*Id.* at 38:1-7.) McMahon followed him down a staircase and was "concerned" about Plaintiff going into or near the judge's lobby, but he walked past that set of doors. (*Id.* at 38:1-17.) As they neared the courtroom, he was "yelling and screaming, continuing, 'I'm going to see the judge right now. You're not going to stop me.'" (*Id.* at 38:19-39:4.) She "was right on his heals [sic] behind him, but [she] was not touching him." (*Id.* at 39:4-5.) She never told him he could not go in the courtroom, but when he got to the courtroom door, she exhorted him to calm down and see the judge after gathering himself. (*Id.* at 39:11-22.) He ignored her and entered the courtroom as she continued to trail him. (*Id.* at 39:23-40:8.) The judge was not on the bench; McMahon grew concerned Plaintiff would attempt to pass through the partitions and enter chambers through the back of the courtroom, so she placed herself between Plaintiff and the intervening passage. (*Id.* at 39:4-40:10.)

McMahon remembers no one else in the courtroom except court security officer John Donati ("Donati"). (*Id.* at 40:9-41:23.) Plaintiff "was still yelling and screaming, 'I'm going back to see [the judge] now. Why won't you let me back there[?]'" (*Id.* at 42:3-5.) McMahon replied that he was not allowed to see the judge unexpectedly; she "gestured" her hand against Plaintiff's upper left arm and told him he had to calm down and leave. (*Id.* at 41:23-43:6.) Plaintiff "whipped his arm up" to deflect McMahon's "gestur[ing]" arm; in doing so, he brushed it against her face and, but for her responsive head movement, "he would have made contact, striking [her] face." (*Id.* at 43:16-44:5.)

Donati began to cross the courtroom. (*Id.* at 43:10-15.) He intervened and grabbed Plaintiff's arm. (*Id.* at 44:8-10.) Plaintiff was "still very agitated, very much screaming . . . and was not happy" (*id.* at 44:16-19), but he did not attempt to strike McMahon or Donati (*id.* at 45:15-19). McMahon and Donati walked Plaintiff toward a "security station" and out of the building; Plaintiff exited the building into the parking lot where he continued "yelling and screaming." (*Id.* at 45:2-46:1, 47:21-48:10.) McMahon testified Plaintiff did not attempt to turn around and return to the courtroom as officers escorted him out of the courthouse. (*Id.* at 47:15-17.) She has no memory of Defendant being involved with the altercation, although she noticed him observing the situation near the exit of the building. (*Id.* at 48:11-49:11.)[2]

Donati, who apparently was not deposed, provided a sworn affidavit attaching a contemporaneous incident report he wrote. In the affidavit, Donati attested that he was "the one who physically escorted Mr. Gaetani from the courthouse." (Donati Aff. (Dkt. No. 77-1, Ex. 6) at ¶ 4.) The incident report corroborated that claim in brief and general terms. (Donati Aff. (Dkt. No.

---

[2] By Hadley's account, he heard a commotion while sitting in his office and exited to find McMahaon and Donati escorting Plaintiff toward the building's exit. (Hadley Dep. Tr. (Dkt. No. 77-1, Ex. 5) at 37:1-39:24.) Hadley remembers Donati being on Plaintiff's left side and McMahon following behind on the right. (*Id.* at 63:15-20.) Donati was touching Plaintiff, but McMahon was not. (*Id.* at 63:21-64:2.) At the time, Hadley was 6'5" tall and weighed approximately 260 pounds. (*Id.* at 17:11-18.)

77-1, Ex. 6-A).) Katherine Wright, a courtroom clerk, echoed this claim in a brief, half-page affidavit. (Wright Aff. (Dkt. No 77-1, Ex. 7) at ¶¶ 5-7.)

Defendant retained a use of force expert who submitted a report explaining use of force training for Massachusetts court officers, assessing how a reasonable officer would perceive Plaintiff's conduct based on various witnesses' accounts, and opining on the reasonableness of the court officers' responses. (Fitzgerald Rpt. (Dkt. No. 77-1, Ex. 9).) Based on the various witnesses' accounts, the expert concluded that the court officers' uses of force were objectively reasonable. (*Id.*)

## B.    Plaintiff's Version of Events

Plaintiff's deposition testimony paints an entirely different picture. Plaintiff—who was 63 years old, 5'9" tall, and weighed 214 pounds at the time of the incident—asserts that when he relayed the judge's order for a writ of *habeas corpus* to clerk's office personnel, he was told "the judge didn't say that" and Plaintiff instead needed a capias. (Plaintiff Dep. Tr. (Dkt. No . 113-2[3]) at 14:5-13, 15:21-23; Plaintiff Medical Records (Dkt. No. 113-6) at 2 of 14[4] and MR00336.) Plaintiff explained to the clerk's office staff that he had just come from the "courtroom within the last minute or so," and the judge had ordered the issuance of a writ of *habeas corpus.* (Plaintiff Dep. Tr. (Dkt. No . 113-2) at 15:1-7.) He "explained to them that they were wrong, that the judge had [him] come up to get a habeas corpus, not a capias." (*Id.* at 16:7-10.) Plaintiff acknowledged he was "a little bit heated in stating to them" that they were "wrong." (*Id.* at 16:16-20, 17:8-14.) His voice "elevated" slightly above his normal speaking voice when the staff persisted in their error because he was "emphasizing [the] point" that he had just spoken with the judge who had told him to get a writ of *habeas corpus.* (*Id.* at 17:19-18:16.) He did not recall whether he leaned over the desk, whether court security officers were present, or whether anyone asked him to "calm down." (*Id.* at 18:17-19:11.)

---

[3] Various excerpts of Plaintiff's deposition testimony are available at Dkt. Nos. 77-1 and 113-2.

[4] Page 2 of 14 of Plaintiff's medical records at Dkt. No. 113-6 does not have a Bates number.

After the clerk's office persisted in error, Plaintiff said he was going speak with the judge, left the clerk's officer, and walked at "normal speed" towards the courtroom. (*Id.* at 15:11-12, 20:3-21.) As he opened the courtroom door, "[s]omebody grabbed" him, and a voice from behind him said, "you're out of here." (*Id.* at 21:3-21:22.) He did not have time to respond before, as Plaintiff described it, a man "put my arm behind my back . . . with my wrist about waist level, and then he thrusted upward" "toward my shoulder." (*Id.* at 27:1-14, 77:9-22.) Plaintiff believes the man's "other hand was on [Plaintiff's] shoulder." (*Id.* at 28:2-3.) Plaintiff identified the man as Hadley. (*Id.* at 133:15-18.)

Feeling "terrible" pain in his shoulder, Plaintiff declared several times, "I think you just broke my shoulder." (*Id.* at 32:1-34:22.) Plaintiff explained: "I was saying it when they first grabbed me in the doorway, and it happened almost instantly when he broke my shoulder, I said, you're hurting my shoulder, my shoulder is hurting terrible [sic], you're hurting my shoulder." (*Id.* at 34:15-22.)

While Hadley thrust Plaintiff's wrist toward his shoulder, a woman took hold of Plaintiff's left side. (*Id.* at 28:10-13.) She had both of her "hands on [Plaintiff's] arm and [his] shoulder on the other side." (*Id.* at 28:16-21.) Hadley and the woman "were trying to lead [Plaintiff] out of the courtroom." (*Id.* at 28:21-22.) Plaintiff identified the woman as McMahon. (*Id.* at 133:19:21.)

Officers escorted Plaintiff out of the courthouse in a period of two to four minutes, "grasp[ing]" him and walking him to the exit. (*Id.* at 32:1-34:22.) Plaintiff struggled to some extent but did not try to escape the officers' clutches. (*Id.* 33:21-43-14 ("I wasn't trying to resist them. I was in their grasps. But I was making it clear that my shoulder was hurting.").) He testified he did not resist Hadley, but when McMahon grabbed his left harm, he believed his right arm had been broken, and he was trying to protect himself and not have his left arm pulled behind his back. (*Id.* at 141:9-142:10.) Plaintiff further described his encounter with McMahon: "She's a court officer taking me

out of the courtroom. I know her job and I tried to comply the best I could. However, I wasn't about to get my left shoulder broken either. So I tried to keep my [left] arm from going behind my back the best I could." (*Id.* at 142:14-22.) He testified he did not swing at McMahon or hit any of the court officers. (*Id.* at 33:24-34:1, 142:11-12.) McMahon corroborated this testimony. (McMahon Dep. Tr. (Dkt. No. 77-1, Ex. 4) at 45:15-19.)

After officers pulled Plaintiff out of the courtroom, he first stepped backwards but then turned around to face forward and walk toward the exit. (Plaintiff Dep. Tr. (Dkt. No . 113-2) at 34:23-35:18.) He testified his feet were not dragged on the ground but then testified he does not recall his feet being dragged on the ground. (*Id.* at 35:11-12, 19-21.) Outside the courthouse, Plaintiff saw John Bernardo, a local attorney, and told Bernardo he thought the officers had broken his shoulder. (*Id.* at 40:1-22.)

Bernardo's deposition testimony corroborates Plaintiff's version of events in several key respects but differs from Plaintiff's in others. Bernardo testified he was in the courtroom when Plaintiff entered and said (to whom is unclear): "'I need to see the judge. The girls upstairs said they don't know anything, they can't do something, I need to see the judge.'" (Bernardo Dep. Tr. (Dkt. No. 77-1, Ex. 10[5]) at 10:2-14.) Someone or some group of people told Plaintiff he could not see the judge. (*Id.* at 10:15-16.) Plaintiff said aloud in the courtroom that the judge told him to go to the clerk's office, but the clerk's office staff could not help him, and, as a result, he needed to see the judge. (*Id.* at 10:17-24.) He was told again to leave, and someone—Bernardo believes it was a clerk named Dave Kearns—said, "'Get him out of here.'" (*Id.* at 11:1-7.) Before this point, court officers were not around Plaintiff, but the officers in the courtroom then surrounded him, and other officers came down from upstairs into the courtroom. (*Id.* at 11:7-14.) Plaintiff looked at Bernardo and

---

[5] Various excerpts of Bernardo's deposition testimony are available at Dkt. Nos. 77-1 and 113-3.

asked, "'Hey, John, can they throw me out like this?'" (*Id.* at 11:15-17.) Then the courtroom door opened, and "in stepped the biggest court officer there, Dave Hadley," who "grabbed [Plaintiff] by the arm." (*Id.* at 11:18-20.) Hadley had come in "rapidly" and "grabbed [Plaintiff's] arm forcefully and yanked him, pulled him out that door." (*Id.* at 11:18-24.) Bernardo continued:

> [When Hadley entered the courtroom, the other court officers] had Mr. Gaetani surrounded. One court officer had him by one hand, another one had him by the other hand. Then it swapped, as to one of the officers. And Dave Hadley, like I said, come in the room, came charging in the door, and just grabbed his arm and yanked him right out. [Plaintiff's] arm was straight out [90 degrees to his body, parallel to the floor,] and [Hadley] yanked him right out.
>
> . . .
>
> I mean, there was no delay. [Hadley] come charging in the room, grabbed [Plaintiff's] arm and just yanked him right out. And the other officers were all around Mr. Gaetani in the rear and to the side.

(*Id.* at 13:18-14:6, 14:24-15:4.) Hadley had two hands on Plaintiff's right arm "just like you grab a baseball bat." (*Id.* at 14:9-10.) Out of concern for Plaintiff's safety, Bernardo followed the group outside and advised Plaintiff to leave the property.[6] (Bernardo Dep. Tr. (Dkt. No. 113-3) at 19:2-21:13.) Plaintiff complained to Bernardo, "'My shoulder, . . . I think they dislocated it.'" (*Id.* at 19:20-21; *see also* Plaintiff Dep. Tr. (Dkt. No. 113-2) (40:19-22) ("I was telling Mr. Bernardo that I thought they broke my shoulder.").)

## C.    Plaintiff's Shoulder Injury

Plaintiff's medical records show he went to a doctor about his shoulder several times in the days and weeks following the incident. (Plaintiff Medical Records (Dkt. No. 113-6) at MR00336-37, MR00339-42.) The doctor sent him to an orthopedic surgeon, Dr. Herb Bote. (Plaintiff Dep. Tr.

---

[6] With respect to his concerns about Plaintiff's safety, Bernardo testified: "In the past, I've watched [court officers] take somebody outside and kick them. I'm not a Don Quixote. But I don't want to see somebody get roughed up unfairly. And I wanted to make sure that didn't happen to him." (Bernardo Dep. Tr. (Dkt. No. 113-3) at 21:9-13.)

(Dkt. No. 113-2) at 50:7-16.) Dr. Bote informed Plaintiff he "had some torn tissues in [his] shoulder." (Plaintiff Dep. Tr. (Dkt. No. 113-2) at 50:20-24; *see also* Plaintiff Medical Records (Dkt. No. 113-6) at MR00344 ("ASSESSMENT: 840.4 Right Rotator cuff tear (Severe; Worsening)").) Plaintiff subsequently underwent surgery, which "failed" and "had to be corrected." (Plaintiff Dep. Tr. (Dkt. No. 113-2) at 51:1-19.)

Plaintiff also sought medical attention for pain in his right shoulder roughly two weeks *before* the incident at the courthouse. On June 8, 2011, he saw his doctor for "recurrent pain in his right shoulder" that had been "progressively more painful over the last three to four days, although in duration it ha[d] been uncomfortable for probably two weeks." (Plaintiff Medical Records (Dkt. No. 115-2) at GMED053). The doctor injected "[a] local anesthetic [that] provided prompt relief." (*Id.*)

According to Plaintiff's statement of facts, "Plaintiff did have surgery on his shoulder three months after the June 22 incident, but has offered no admissible evidence that surgery or any of Plaintiff's alleged increased shoulder pain were the result of the events on June 22, 2011." (Plaintiff's SOF (Dkt. No. 113-9) at ¶ 31.)

### III. SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Bellone v. Southwick-Tolland Reg'l Sch. Dist.*, 748 F.3d 418, 422 (1st Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "[A] nonmovant can forestall summary judgment by 'present[ing] definite, competent evidence' demonstrating the existence of a genuine dispute about a material fact." *Murray v. Kindred Nursing Ctrs. W. LLC*, 789 F.3d 20, 25 (1st Cir. 2015) (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991)). "'A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.' . . . 'A fact is material if it has the potential of determining the outcome of the litigation.'" *Patco Constr. Co. v. People's United Bank*, 684

F.3d 197, 206-07 (1st Cir. 2012) (quoting *Rodríguez-Rivera v. Federico Trilla Reg'l Hosp. of Carolina*, 532 F.3d 28, 30 (1st Cir. 2008)). The court must view the facts and draw inferences from those facts in the light most favorable to the non-movant. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (citation omitted). "In a case in which the parties offer diametrically opposite versions of the facts, each founded on first-hand knowledge, we must ask whether the account propounded by the nonmovant suffices to thwart the swing of the summary judgment ax." *Morelli v. Webster*, 552 F.3d 12, 18 (1st Cir. 2009). However, "[t]he role of the trial judge at the summary judgment stage 'is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 167 (1st Cir. 1998) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Similarly, "the court should not engage in credibility assessments." *Domínguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 432 (1st Cir. 2000).

## IV.    DISCUSSION

Defendant raises two arguments in his summary judgment motion. First, because of Donati's contemporaneous incident report in which he admits he seized Plaintiff, no reasonable jury could find in Plaintiff's favor. (*See* Section IV.A below.) Second, in the alternative, Defendant is entitled to qualified immunity. Defendant's motion requires the court to strike a difficult balance between summary judgment standards and the doctrine of qualified immunity. (*See* Section IV.B below.)

### A.    Summary Judgment Analysis

Defendant's primary argument is that he is entitled to summary judgment on all counts because Donati admitted he—not Hadley—seized Plaintiff. Defendant urges the court to adopt his and Donati's versions of the facts and disregard Plaintiff's and Bernardo's because there are discrepancies between Plaintiff's testimony and Bernardo's. According to Defendant, no rational

fact finder could conclude that he seized Plaintiff, and Plaintiff's version of the facts "requires him
to prove a vast conspiracy by numerous people to cover up for Hadley, but [Plaintiff] has not alleged
that such a conspiracy exists, much less any facts to support the claim."[7] (Defendant's Br. (Dkt. No.
112) at 9.) Plaintiff, on the other hand, counters that his testimony and Bernardo's are consistent on
the key fact that Hadley grabbed Plaintiff.[8] More importantly, the witnesses' accounts present factual
issues that turn on credibility determinations. For example, the questions of "[w]hether Hadley was
the officer who caused [Plaintiff's] rotator cuff tear" and "why another officer may wish to

---

[7] Defendant's argument that no reasonable juror could conclude that Hadley (rather than Donati) seized
Plaintiff relies on cases too far afield. (Defendant's Br. (Dkt. No. 112) at 8-11.) For example, in *Scott v. Harris*,
550 U.S. 372 (2007), the Supreme Court rejected the plaintiff's account at summary judgment of a high-speed
chase because its depiction of a mild and generally safe pursuit was "blatantly contradicted" by video footage.
The Court explained: "When opposing parties tell two different stories, one of which is blatantly contradicted
by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts
for purposes of ruling on a motion for summary judgment." *Id.* at 380. Here, much to the contrary, there is
no video footage or other evidence that clearly undermines Plaintiff's version of events. Rather, Bernardo's
third-party account corroborates Plaintiff's testimony as to the identity of the alleged assailant and
supplements it as to details regarding use of force.

*Robinson v. Prince George's Cty., Md.*, 465 F. App'x 238 (4th Cir. 2012) (per curiam) too is distinguishable. There,
the Fourth Circuit affirmed summary judgment in the defendants' favor because the plaintiffs' "conjecture"
that a certain officer fired a fatal shot was "without any shred of evidentiary support" where the officer's
"service weapon was examined on the scene and it was determined that it had not been fired recently." *Id.* at
240. Here, though, the only evidence of what happened in the courtroom and who touched Plaintiff is
various eyewitnesses' competing accounts, which the court cannot weigh on summary judgment.

[8] In his reply brief, Defendant argues that discrepancies between Plaintiff's and Bernado's accounts
impermissibly "muddle[] the specific facts" at issue, and Defendant contends Plaintiff "'manufacture[d] a
dispute of fact by contradicting his earlier sworn testimony without a satisfactory explanation of why the
testimony [was] changed.'" (Defendant's Reply Br. (Dkt. No. 114) at 4 (quoting *Abreu-Guzmán v. Ford*, 241
F.3d 69, 74 (1st Cir. 2001)).) The court is not persuaded. Discrepancies between Plaintiff's and Bernardo's
accounts ultimately go to the weight, not admissibility, of their testimony. A reasonable juror could fairly
conclude that Plaintiff's testimony is credible even if his memory as to certain details was inaccurate or
distorted given his "heated" emotional state. Such an inference is all the stronger considering Plaintiff
testified he did not remember certain aspects of his encounter, including whether he was leaning over the
clerk's office counter, whether he was asked to calm down, or whether anyone followed him out of the clerk's
office. (Plaintiff Dep. Tr. (Dkt. No . 77-1, Ex. 3) at 18:22-23 (does not recall leaning over counter), 19:6-11
(does not recall being asked to calm down), 20:7-15 (does not recall anyone following him).)

*Abreu-Guzmán*, moreover, is inapposite. There, the court considered and rejected the plaintiff's efforts to
contradict his own earlier testimony with an affidavit. 241 F.3d at 74 ("[T]here is no evidence to
support Abreu's allegation other than Abreu's 1999 affidavit," which "is inconsistent with Abreu's earlier
sworn statement."). That is not the situation here, where a third-party witness contradicts Plaintiff's testimony
only on minor details, and Plaintiff's recollection of some details is admittedly hazy.

incriminate himself in order to exonerate his superior (Hadley) should" be left to the jury. (Plaintiff's Opp. (Dkt. No. 113) at 7; *see also id.* at 5 ("Hadley is Donati's superior and a reasonable jury could believe Donati was protecting his superior when writing his report and would disregard his testimony.").).)[9]

This case is rife with disputes of material fact that will depend the jury's assessment of witnesses' credibility. The parties dispute *the* key issue in this case: did Defendant (or someone else) seize Plaintiff? The parties also dispute whether Defendant's use of force (assuming it was Defendant who used force) was reasonable. *See Cyrus v. Town of Mukwonago*, 624 F.3d 856, 862 (7th Cir. 2010) (summary judgment not warranted in light of "conflicting evidence about just how much force" officer used, which "bears directly on whether that force was a reasonable response to the situation"). Defendant highlights discrepancies between Plaintiff's testimony and Bernardo's—e.g., whether Plaintiff was all the way in the courtroom when he was seized and the number of court officers present and/or involved—but these differences are minor and do not render either witness's testimony implausible or inadmissible. (*See* footnote 8, *supra*.) Defendant can exploit discrepancies between Plaintiff's and Bernardo's testimony on cross-examination at trial, but the court cannot resolve factual disputes or weigh credibility at the summary judgment stage. As a result—subject to a determination of whether Defendant is entitled to qualified immunity, which is discussed below—Defendant is not entitled to summary judgment on any claim.

## B.      Qualified Immunity

"Qualified immunity is a judicial gloss designed to allow public officials to perform discretionary tasks without the constant threat of legal liability." *Morelli*, 552 F.3d at 18. "A

---

[9] Defendant contends Plaintiff's argument that Donati would take the fall for his boss is an "unsupported conspiracy theory." (Defendant's Reply (Dkt. No. 114) at 8.) These are issues of witness credibility, and, on cross-examination, Plaintiff may explore questions along these lines for impeachment purposes.

government official sued under § 1983 is entitled to qualified immunity unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Carroll v. Carman,* 135 S. Ct. 348, 350 (2014) (per curiam). "The doctrine's prophylactic sweep is broad: it leaves unprotected only those officials who, 'from an objective standpoint, should have known that their conduct was unlawful.'" *Alfano v. Lynch*, 847 F.3d 71, 75 (1st Cir. 2017) (quoting *MacDonald v. Town of Eastham*, 745 F.3d 8, 11 (1st Cir. 2014)). In other words, "[t]his doctrine 'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Carroll,* 135 S. Ct. at 350 (quoting *Ashcroft v. al-Kidd,* 563 U.S. 731, 743 (2011)).

There is "a two-prong analysis to determine whether an officer is protected by qualified immunity." *Mitchell v. Miller*, 790 F.3d 73, 77 (1st Cr. 2015) (internal quotation marks and citation omitted). First, has the plaintiff established a violation of a constitutional right, and second, if so, was "the law clearly established at the time of the defendant's alleged violation"? *Id.* (internal quotation marks and citation omitted). The two prongs "need not be considered in any particular order, and both prongs must be satisfied for a plaintiff to overcome a qualified immunity defense." *Raiche v. Pietroski*, 623 F.3d 30, 36 (1st Cir. 2010).

The second prong has two sub-parts: the first "requires the plaintiff to identify either 'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional norm." *Alfano*, 847 F.3d at 75 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). This "analysis 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Id.* at 76 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)); *see also City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019) (per curiam) ("the clearly established right must be defined with specificity" and not "at a high level of generality") (internal quotation marks and citation omitted). "The plaintiff

bears the burden of demonstrating that the law was clearly established at the time of the alleged violation, and it is a heavy burden indeed." *Mitchell*, 790 F.3d at 77. Even so, there need not be existing case law addressing the precise factual situation an officer encounters; instead, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *see also Alfano*, 847 F.3d at 76 ("[I]t is enough if the existing precedents establish the applicable legal rule with sufficient clarity and specificity to put the official on notice that his contemplated course of conduct will violate that rule."); *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (per curiam) ("Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue. Precedent involving similar facts can help move a case beyond the otherwise hazy border between excessive and acceptable force and thereby provide an officer notice that a specific use of force is unlawful.") (internal quotation marks and citations omitted).

The second sub-part of the second prong

> asks whether an objectively reasonable official in the defendant's position would have known that his conduct violated that rule of law. The question is not whether the official actually abridged the plaintiff's constitutional rights but, rather, whether the official's conduct was unreasonable, given the state of the law when he acted.

*Alfano*, 847 F.3d at 75 (internal citations omitted); *see also City & Cnty. of San Francisco, Cal. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) ("An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in [his] shoes would have understood that he was violating it, meaning that existing precedent . . . placed the statutory or constitutional question beyond debate.") (internal quotation marks and citations omitted). "The dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (emphasis omitted) (quoting *al-Kidd,* 563 U.S. at 742).

"The doctrinal intersection of qualified immunity principles and summary judgment principles is not well mapped. Plotting that intersection can present thorny analytic problems—problems that are magnified because of the desire to resolve claims of qualified immunity at the earliest practicable stage of litigation." *Morelli*, 552 F.3d at 18. Summary judgment standards require the court to "take the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiff" and demand "absolute deference to the nonmovant's factual assertions," whereas qualified immunity, when raised on summary judgment, demands deference to the reasonable, if mistaken, actions of the movant-defendant. *Morelli*, 552 F.3d at 18-19, 21 (internal citations omitted). "In order to ease this inherent tension," the First Circuit advises "cabin[ing] these standards and keep[ing] them logically distinct, first identifying the version of events that best comports with the summary judgment standard and then asking whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." *Id.* at 19; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007) ("When things are in such a posture [(i.e., assessing qualified immunity at the summary judgment stage)], courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the [summary judgment] motion. In qualified immunity cases, this usually means adopting (as the Court of Appeals did here) the plaintiff's version of the facts.") (internal quotation marks and citations omitted).

Applying that framework, the court will first identify the version of events that best comports with the summary judgment standard and then move to the qualified immunity analysis.

### i.     The Version of Events that Best Comports with the Summary Judgment Standard

When the summary judgment standard is carefully applied, with all material disputes and ambiguities resolved in Plaintiff's favor, the following factual theory results. Plaintiff visited the clerk's office and grew frustrated, elevated his voice to a minor degree and was a "little bit heated" due to mistakes and assertions made by that office. Plaintiff left the clerk's office to go to the

courtroom to speak with the judge to confirm he needed a writ of *habeas corpus*. Once there, Plaintiff was advised he could not see the judge. Plaintiff repeated his desire to see the judge, causing a courtroom clerk to urge the officers to "get him out of [t]here." Plaintiff turned to Bernardo and asked if he had a right to remain in the courtroom. At or around that point, Defendant—who was 8 inches taller and approximately 45 pounds heavier than Plaintiff—approached Plaintiff from behind, placed both of his hands on Plaintiff's arm, and forcibly yanked him by the arm towards the door. Defendant grabbed Plaintiff's arm as though, as Bernardo described, Defendant were holding a baseball bat. Plaintiff felt immediate, sharp pains, cried out, and repeatedly said he thought his shoulder was broken as officers escorted him outside. Plaintiff did not resist being removed from the courtroom or escorted out of the courthouse, and he did not try to re-enter the courtroom. He did not hit any court officer or swing at McMahon. Plaintiff was later diagnosed with a torn rotator cuff and underwent a mostly unsuccessful surgery. He admitted he has not produced evidence establishing that his increased shoulder pain or need for surgery resulted from the incident at the courthouse.

ii.     **Qualified Immunity Prong One: Whether Defendant Violated Plaintiff's Clearly Established Right to Be Free from Unreasonable Force**

The first prong of the qualified immunity analysis asks whether Defendant violated one of Plaintiff's clearly established rights. Plaintiff's "burden of demonstrating that the law was clearly established at the time of the alleged violation" is a "heavy" one. *Mitchell*, 790 F.3d at 77. The right at issue here is the right to be free from unreasonable force, which stems from the right to be free from unreasonable seizures under the Fourth Amendment. *See Raiche*, 623 F.3d at 36. The use of force during a "'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). The court analyzes excessive force claims "according to the constitutional touchstone of objective reasonableness" and disregards

an "officer's subjective 'intent or motivation.'" *Raiche*, 623 F.3d at 36 (quoting *Graham*, 490 U.S. at 397).

The issue is whether "the defendant officer employed force that was unreasonable under the circumstances." *Id.* at 36 (internal quotation marks and citation omitted). This requires balancing "the individual's interest against the government's, weighing three non-exclusive factors: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* (internal quotation marks omitted) (quoting *Graham*, 490 U.S. at 396). These three factors from *Graham v. Connor* must be "viewed in the context of 'the totality of the circumstances.'" *Alexis v. McDonald's Rests. of Mass., Inc.*, 67 F.3d 341, 353 (1st Cir. 1995) (quoting *Graham*, 490 U.S. at 396); *see also Jarrett v. Town of Yarmouth*, 331 F.3d 140, 148 (1st Cir. 2003) ("Courts conducting this balancing exercise must undertake a fact-intensive inquiry that is highly sensitive to the circumstances of the particular case."). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Id.* (internal quotation marks and citation omitted).

None of the *Graham* factors weighs in Defendant's favor. As to the first—the severity of the crime at issue—Plaintiff was not arrested for or accused of committing a crime.[10] Looking at his

---

[10] Defendant presents a conclusory argument that there was probable cause to arrest Plaintiff under MASS. GEN. LAWS c. 272, § 53(b) (disorderly conduct) or MASS. GEN. LAWS c. 268, § 13C (disruption of court proceedings). (Def.'s Mem. (Dkt. No. 112) at 19-20.) No court proceedings were going on when Plaintiff re-entered the courtroom, but his conduct may have constituted disorderly conduct. Regardless, assuming there was probable cause to arrest Plaintiff for violating either statute, both are misdemeanors. A first disorderly conduct violation is punishable by a fine of up to $150; subsequent offenses are punishable by a fine of up to $200, imprisonment for up to six months, or both. *See* MASS. GEN. LAWS c. 272, § 53(b). Disrupting court proceedings is punishable by a fine of up to $1,000, imprisonment for up to a year, or both. *See* MASS. GEN. LAWS c. 268, § 13C. As other courts have found, misdemeanors are low in severity, meaning only lesser

conduct in the light most favorable to him, he was a "little bit heated" in the clerk's office, he was entering or entered the courtroom to ask the judge a clarifying question, and he asked Bernardo whether court officers could remove him from the courtroom. "[A] rational jury could find that the force used by [Defendant] to detain" someone "who, at worst," was loud but non-violent and not resisting "was so disproportionate as to offend the Fourth Amendment." *Morelli*, 552 F.3d at 23; *see also Alexis*, 67 F.3d at 353 (collecting cases with trialworthy excessive force claims where plaintiffs' alleged crimes were minor in nature).

Turning to the second factor, there is no indication Plaintiff posed an immediate threat to anyone's safety. Again, based on the facts most favorable to Plaintiff, he was heated in the clerk's

---

degrees of force might be reasonable. *See Brown v. City of N.Y.*, 798 F.3d 94, 102 (2d Cir. 2015) ("[T]he severity of the crime is unquestionably slight. The disorderly conduct offense is subject to a maximum penalty of fifteen days in jail, and the underlying facts, even as alleged by the officers, are loud banging on the door of a closed store by someone wanting to use a bathroom, plus the use of loud and nasty language."); *Fogarty v. Gallegos*, 523 F.3d 1147, 1160 (10th Cir. 2008) (plaintiff allegedly engaged in disorderly conduct, which is classified as among the least severe crimes under New Mexico law, meaning "the amount of force used should have been reduced accordingly"); *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1116 (9th Cir. 2017) (plaintiff suspected of battery after officer received report of someone throwing water balloons at four people and then saw plaintiff carrying water balloons; "the jury could conclude, based on the fact that [plaintiff] was suspected of committing only a misdemeanor, that [officer's] leg sweep maneuver was excessive under the circumstances") (internal citation omitted); *Singleton v. Darby*, 609 F. App'x 190, 202 (5th Cir. 2015) (plaintiff's alleged crime was Class B misdemeanor under Texas law punishable by up to 180 days imprisonment, a fine of up to $2,000, or both; "Although the alleged commission of a minor or misdemeanor offense is not to be taken lightly, we repeatedly have recognized that it militates against concluding that the use of significant force was objectively reasonable."); *Yates v. Terry*, 817 F.3d 877, 885 (4th Cir. 2016) ("[plaintiff's] alleged violations are nonviolent, minor traffic infractions," and the basis for detaining plaintiff (driving without a license) was "only a misdemeanor"; "When the offense committed is a minor one, we have found that the first *Graham* factor weigh[s] in plaintiff's favor.") (internal quotation marks and citation omitted); *Gomez v. City of Norwalk*, No. 3:15CV1434 (MPS), 2018 WL 780213, at *4 (D. Ct. Feb. 8, 2018) (plaintiff pled guilty to breach of the peace, a Class B misdemeanor under Connecticut law punishable by up to six months imprisonment; "The 'severity of the crime at issue' factor presents a thin reed for the defendants given that neither the facts underlying [plaintiff's] conviction—i.e., that [he] was drunk and belligerent—nor the crime of which he was convicted were severe in nature.") (citation omitted); *cf. E.W. by & through T.W. v. Dolgos*, 884 F.3d 172, 180 (4th Cir. 2018) ("At the time Dolgos handcuffed E.W., Dolgos knew that E.W. had at most committed misdemeanor assault in the second degree [(punishable by up to 10 years imprisonment, a fine of up to $2,500, or both)] by hitting another little girl for stepping on her foot. But because assault is an offense that can be considered violent if committed by any person, even a child, we find that this factor weighs against E.W. This finding is tempered, though, by the fact that the offense is a misdemeanor.") (internal citation omitted).

office, went to the courtroom to speak with the judge, and never hit any court officer or swung at McMahon. Even portions of McMahon's testimony demonstrate he was not an immediate threat. She testified she had been concerned that immediately after Plaintiff left the clerk's office, he would "barge" into the back entrance to the judge's lobby. (McMahon Depo. Tr. (Dkt. No. 75-3, Ex. 4) at 38:9-15.) But he did not try to enter the judge's lobby. (*Id.* at 38:16-17.) He passed that set of doors, continued to the courtroom, passed the first entrance to the courtroom, and went to the second courtroom entrance. (*Id.* at 38:19-20, 39:13-18.) McMahon was "surprised" he did not use the first entrance because that was "the quickest way" into the courtroom. (*Id.* at 39:15-18.)

Third, there is no evidence Plaintiff resisted arrest or attempted to flee. Plaintiff testified he was concerned about his left arm being grabbed the way his right arm had been, but he did not resist being removed from the courtroom, and walked with the court officers out of the courthouse.

Defendant cited several cases in which officers were found to have used reasonable force. All are factually distinguishable, even *Watson v. Perez*, 168 F. Supp. 3d 365 (D. Mass. 2016), which is the most similar to this case. In that case, Watson complied with a court officer's order to leave a courtroom, but court officers began beating him in an anteroom between the courtroom and the public hallway. *Id.* at 368. Watson's pregnant wife, Espino, begged the officers to stop; they ignored her, so she began videotaping the beating with her cell phone. *Id.* A court officer told Espino to leave the area, but she did not want to because she was concerned about her husband. *Id.* at 369. The officer "grabbed Espino's arm, causing her pain, and forced her out of the area" to "a bench next to the courtroom." *Id.* The court dismissed the excessive force claim against the officer who grabbed Espino, finding the level of contact was not excessive under the circumstances: the officer "first told Espino to leave the area and then used a grip on her arm to escort her to a bench. This force was minimal, did not result in injury, and was necessary to effectuate the removal of Espino from the immediate area." *Id.* at 371. The facts of *Watson*, as they relate to an officer grabbing

someone's arm, are somewhat similar to the facts of the present case. However, as Defendant concedes, the officer in *Watson* was alleged to have used less force than Defendant. And, as the *Watson* court explained, the force was necessary to remove Espino from the area where there was a violent, physical confrontation involving her husband. *Id.* The circumstances in the present case are materially different: there was no violent confrontation, and Defendant allegedly used enough force that Plaintiff immediately and repeatedly said he thought his shoulder was broken.

In *Bettis v. Bean*, No. 5:14-CV-113, 2015 WL 5725625 (D. Vt. Sept. 29, 2015), officers responded to a 911 call for a domestic disturbance. *Id.* at *1-2. When they arrived, they could hear screaming inside the house. *Id.* at *2. In the house, officers found the decedent—who, unbeknownst to them, suffered from several illnesses and injuries—holding and squeezing his wife's wrists as she was crying. *Id.* at *1, *3. He did not comply with the officers' orders to let go, so they pried his hands from his wife's wrists. *Id.* at *3. One officer subsequently performed a rear wrist lock on the decedent to handcuff him. *Id.* The decedent pulled away, the officer heard a snap, the decedent's arm went limp, and he repeatedly said his arm was broken. *Id.* He underwent two surgeries and later passed away due to an infection. *Id.* at *5. The court found the officer's use of force was reasonable because the decedent ignored verbal commands to release his wife, and, after officers pried his "hands from his wife's wrists, he remained noncompliant, agitated, and difficult to subdue." *Id.* at *11. He "was a large man who appeared strong and capable of inflicting injury," and there were no "indicia that he was suffering from any kind of pre-existing injury. He was swearing, repeatedly stating that he was not taking any more abuse, and he appeared both angry and upset." *Id.* at *12. The severity of the crime, the threat to officers' and others' safety, and the level of the person's resistance in *Bettis* are all significantly greater than in the present case, where they are nil.

In *Calvi v. Knox Cnty.*, 470 F.3d 422 (1st Cir. 2006), police responded to a 911 call from a man about a woman brandishing a knife in his house. *Id.* at 425. Roughly when officers arrived, a

second man, who lived at the house but had fled, called 911 asking if it was safe to go back. *Id.* The second man returned and played an audio recording for police of the woman yelling when she grabbed a butcher knife in the house, ignoring people's pleas to be reasonable. *Id.* Police located the woman in the house, handcuffed her, put her in a cruiser, and transported her to lockup. *Id.* The court found the handcuffing did not involve excessive force: "Standard police practice called for cuffing an arrestee's hands behind her back and Smith's decision not to deviate from this practice was a judgment call, pure and simple. He handcuffed Calvi in the customary manner and kept her in handcuffs for no more than the time reasonably necessary to transport her to the lockup." *Id.* at 428. The facts of *Calvi* are not at all similar to the facts here and do not support the conclusion that Defendant's conduct was reasonable.

The plaintiff in *Andrews v. Fuoss*, 417 F.3d 813 (8th Cir. 2005), approached her son in a courtroom while waiting for his sentencing for a "spree" of violent crimes, including assault and battery. *Id.* at 815. The sheriff, acting as courtroom bailiff, had previously told the plaintiff and her son that she could not have physical contact with him; the sheriff also had created a rule—of which the plaintiff was unaware—that no one except her son's lawyer could be within 10 feet of her son. *Id.* As she approached her son, the sheriff allegedly dealt a "forceful blow" to her shoulder. *Id.* The court found that stopping her and the sheriff's use of force were reasonable due to her son's violent history, the need to maintain order and security in the courtroom, and the plaintiff's injuries being "no more than de minimis." *Id.* at 817-18 (quoting Eighth Circuit cases holding that "'a de minimis use of force or injury is insufficient to support a finding of a constitutional violation'") (citation omitted). While the court officers in this case certainly had a legitimate interest in ensuring courtroom security, Plaintiff was not attempting to interact with someone with a history of violence about which the court officers were concerned. Moreover, as the First Circuit has held, "liability may be imposed for the use of excessive force even in the absence of a serious injury." *Bastien v. Goddard*,

279 F.3d 10, 14 (1st Cir. 2002) ("Although the severity of the injury also may be considered, we have stated explicitly that a 'serious injury' is not a prerequisite to recovery.") (internal citation omitted).

The plaintiff in *Preast v. McGill*, 65 F. Supp. 2d 395 (S.D. W. Va. 1999) had an altercation with court officers, but the duration and severity of his conduct were much more serious than Plaintiff's here. In *Preast*, the plaintiff—a vexatious pro se litigant who had been barred from filing cases in West Virginia's federal and state courts—was physically removed from the courthouse after becoming upset during a hearing. *Id.* at 398-99, 399 n.4. News cameras then captured video footage of the plaintiff angrily and "furiously gesturing" at court officers at the courthouse entrance, taunting them to come outside, re-entering the courthouse and then attempting to flee, and resisting arrest. *Id.* at 400-01.

Finally, in *Peña-Borrero v. Estremeda*, 365 F.3d 7 (1st Cir. 2004), the plaintiff was handcuffed when he was arrested at his home pursuant to a warrant, which exacerbated pre-existing, non-obvious injuries. *Id.* at 10, 12. The First Circuit found the plaintiff had failed to state a plausible excessive force claim where he merely alleged that officers "'pushed both of [his] arms up behind his back up to almost his neck, whereby plaintiff told them that they were hurting him. Plaintiff was injured while being handcuffed in front of his two children.'" *Id.* at 12. In contrast to *Peña-Borrero*, this case does not involve the sufficiency of allegations regarding police use of force while handcuffing an arrestee pursuant to a warrant.

In sum, none of Defendant's arguments is persuasive.

### iii.     Qualified Immunity Prong Two

#### a.     Sub-Part One: Whether Controlling and Persuasive Authorities Send a Clear Signal Regarding the Reasonableness of Defendant's Use of Force

There is "'controlling authority' or a 'consensus of cases of persuasive authority' sufficient to send a clear signal to a reasonable official that certain conduct falls short of the constitutional

norm." *Alfano*, 847 F.3d at 75 (quoting *Wilson*, 526 U.S. at 617). It is a longstanding principle of Fourth Amendment jurisprudence that the reasonableness of an officer's use of force is assessed based on the circumstances and the three factors from *Graham*. First Circuit

> case law supplies a crystal clear articulation of the right, grounded in the Fourth Amendment, to be free from the use of excessive force by an arresting officer. *See, e.g., Alexis,* 67 F.3d at 353-54 (concluding excessive force claim triable when officer seized and dragged plaintiff to effectuate arrest for crime of trespassing in a public restaurant). Given this well-settled jurisprudence, there is no legitimate doubt that the right asserted here was clearly established. Thus, [the officer] was on notice that a police officer's use of excessive force would be offensive to the Constitution.

*Morelli*, 552 F.3d at 23-24. Moreover, cases decided before the events at issue demonstrate circumstances where pulling someone's arm like Defendant did constituted unreasonable force. *See, e.g.*, *Alexis*, 67 F.3d at 346, 353 (officer "suddenly and violently grabbed [woman] and pulled her from the booth and across the table" for allegedly trespassing at a restaurant); *Counter v. Healy*, No. 09-12144-RGS, 2010 WL 2802179, at *5 (D. Mass. June 28, 2010) ("[T]he allegations against [police officer] (that he twisted [plaintiff's] arm violently and injured his shoulder, using more force than was necessary to effect the arrest) suffice to state a claim for excessive force in violation of the Fourth Amendment."); *Lozano Benítez v. Rivera Ruiz*, No. 08-1766(SEC), 2009 WL 1940402, at *4-*5 (D.P.R. July 6, 2009) (plaintiff sufficiently pled excessive force claim where officer allegedly "violently twist[ed] [plaintiff's] arm," which caused plaintiff to fall on road). As a result, Defendant was "on notice" that excessive use of force—including grabbing someone's arm, depending on the circumstances—violates the constitution, "even [if he faced] novel factual circumstances." *Hope*, 536 U.S. at 741.

**b.** **Sub-Part Two: Whether a Reasonable Officer Would Have Known Defendant's Conduct Was Unlawful**

The last question is whether Defendant's "use of excessive force constituted the type and kind of erroneous judgment that a reasonable . . . officer under the same or similar circumstances might have made." *Morelli*, 552 F.3d at 24. As the First Circuit has explained:

> This inquiry is a complicated one. By definition, excessive force is unreasonable force. But reasonable people sometimes make mistaken judgments, and a reasonable officer sometimes may use unreasonable force. In that event, qualified immunity gives an officer the benefit of a margin of error. Thus, defeating a qualified immunity defense requires a showing of an incremental degree of error—an incommensurate use of force beyond that needed to establish a garden-variety excessive force claim and, further, beyond the hazy border [between excessive and acceptable force].
>
> Looked at another way, qualified immunity is appropriate in an excessive force case when an officer correctly perceive[s] all of the relevant facts but [has] a mistaken understanding as to the legality of his chosen level of force. Conversely, qualified immunity protection would not be available when the level of force chosen by the officer cannot in any way, shape, or form be justified under those facts.

*Id.* (internal quotation marks and citations omitted). At the summary judgment stage, the court must determine "whether under the plaintiff's version of the facts a reasonable officer should have known that the degree of force used was plainly excessive." *Id.* at 25.

Based on Plaintiff's version of the facts, the answer here is "yes." The court has already assessed the *Graham* factors and analyzed cases—decided before the incident in this case—where officers grabbing or twisting people's arms constituted excessive force. Based on those analyses, the court concludes a reasonable officer would have known that the circumstances did not justify yanking Plaintiff's harm like a baseball bat to remove him from the courtroom when he was loud but non-violent and non-threatening. This is especially true given the physical size differences between Plaintiff and Defendant. It may have been reasonable to use some force to prevent Plaintiff from further entering the courtroom. But Defendant's conduct, as Plaintiff and Bernardo described

it, "eclipsed the bounds of reasonableness." *Id.* Thus, Plaintiff met his burden of "thwart[ing] a qualified immunity defense" at the summary judgment stage. *Id.*

## C.  Massachusetts Civil Rights Act Claim (Count IV)

In his summary judgment motion, Defendant asks this court to "reconsider" its denial of his motion to dismiss Plaintiff's amended MCRA claim. (Def.'s Br. (Dkt. No. 112) at 20.) The court originally dismissed the MCRA claim because Plaintiff failed to articulate which specific rights he believed had been violated and how those rights were allegedly violated. (Dkt. No. 28 at 13.) Plaintiff amended his complaint to include some factual details, and the court denied Defendant's motion to dismiss the amended complaint, finding the MCRA claim could proceed based on the alleged violation of Plaintiff's right to be free from unreasonable seizures. (Dkt. No. 53 at 9-10.)

To succeed on his MCRA claim, Plaintiff must establish 1) Hadley "threatened, intimidated or coerced him 2) to prevent him from exercising a constitutional right."[11] *Eason v. Alexis*, 824 F. Supp. 2d 236, 245 (D. Mass. 2011). "The direct violation of a constitutional right does not establish a[n] MCRA violation because 'it is not an attempt to force someone to do something the person is not lawfully required to do.'" *Id.* (quoting *Columbus v. Biggio,* 76 F. Supp. 2d 43, 54 (D. Mass. 1999)); *see also Freeman v. Planning Bd. of W. Boylston*, 419 Mass. 548, 565 (1995) ("[A] direct deprivation of rights, even if unlawful, is not coercive because it is not an attempt to force someone to do something the person is not lawfully required to do."). Put another way, "[c]onduct, even unlawful conduct, however, lacks these qualities [of being threatening, intimidating, or coercive] when all it does is take

---

[11] The MCRA, G.L. c. 12, § 11H, prohibits

> any person or persons, whether or not acting under color of law, [from] interfer[ing] by threats, intimidation or coercion, or attempt[ing] to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth.

someone's rights away directly." *Longval v. Comm'r of Correction*, 404 Mass. 325, 333-34 (1989). Accordingly, "[t]he use of force is not, in itself, 'coercive' within the meaning of the act unless such force is inflicted in order to achieve 'some further purpose.'" *Gallagher v. Commonwealth*, No. CIV.A. 00-11859-RWZ, 2002 WL 924243, at *3 (D. Mass. Mar. 11, 2002) (quoting *Longval*, 404 Mass. at 333-34). In the context of an officer's use of force, a plaintiff's "seizure and arrest cannot satisfy both the 'coercion' and 'violation' elements absent some evidence that the initial force was intended to coerce" the plaintiff. *Eason*, 824 F. Supp. 2d at 245 (finding plaintiff had "conflate[d] the two MCRA requirements" of a violation and coercion by arguing "officers physically coerced him into forgoing his constitutional right to be free from unreasonable seizures, excessive force and unlawful arrest by shoving him over the railing and later arresting him").

Here, there seems to be some confusion over the right(s) with which Plaintiff claims Defendant interfered. In its Memorandum and Order on the motion to dismiss the amended complaint, the court identified three rights from the amended complaint: "(1) the right to obtain justice freely, completely, and promptly under the Massachusetts Constitution; (2) the right to be free from unreasonable searches and seizures under the United States and Massachusetts Constitutions; and (3) the right of free speech under the United States and Massachusetts Constitutions." (Dkt. No. 53 at 9 (citing Am. Compl. (Dkt No. 40) at ¶¶ 46-50).) The court then noted that "[a]t the very least, given that Plaintiff's claim of an unreasonable search and seizure in Count III is moving forward, his claim of an unreasonable search and seizure in connection with Count IV sufficiently identifies a right at issue." (*Id.* at 9.) In his opposition to the summary judgment motion, Plaintiff argues Defendant used "excessive force to prevent [Plaintiff] from conferring with Judge Mulcahy regarding the issuance of a writ of habeas corpus." (Pl.'s Opp. (Dkt. No. 113) at 13.) Plaintiff also argues that "'detention is intrinsically coercive'" and, because he adequately pled that coercive use of force to prevent him from conferring with the judge, the court

should let the MCRA claim proceed. (*Id.* at 12-13 (quoting *Sietins v. Joseph*, 238 F. Supp. 2d 366, 378 (D. Mass. 2003).) Defendant contends, based on evidence produced during discovery, Plaintiff "did not give up a constitutional right by leaving the courtroom (such as the right to pursue his lawsuit)." (Def.'s Br. (Dkt. No. 112) at 20 (emphasis omitted).) In particular, Defendant argues the reason Plaintiff was prevented from speaking with the judge was that the judge was no longer on the bench, meaning any use of force was not the reason Plaintiff could not get clarification from the judge. (Def.'s Reply (Dkt. No. 114) at 11 of 12.)

The parties did not address the second and third rights listed at the top of the preceding paragraph; thus, neither will the court. The first right—to obtain justice freely, completely, and promptly—comes from Article 11 of the Declaration of Rights to the Massachusetts Constitution.[12] The Massachusetts Supreme Judicial Court has described Article 11 as "provid[ing] a right to petition that includes the right to seek judicial resolution of disputes," *Blanchard v. Steward Carney Hosp., Inc.*, 477 Mass. 141, 158 n.24 (2017), and "the right to prompt and impartial administration of justice," *Campatelli v. Chief Justice of Trial Court*, 468 Mass. 455, 475 (2014). Plaintiff has not identified, and the court has not found, any case supporting the theories that a litigant has a right to speak with a judge whenever the litigant chooses or that preventing a litigant from speaking with a judge violates any of the litigant's rights. To the contrary, communication with judges is limited, and litigants generally may not directly contact a judge. For example, ex parte communication is generally prohibited, and litigants are given filing deadlines to submit written communications to the court and given dates and times to appear personally before the court. As the Massachusetts Judicial

---

[12] Article 11 provides:

> Every subject of the commonwealth ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property, or character. He ought to obtain right and justice freely, and without being obliged to purchase it; completely, and without any denial; promptly, and without delay; conformably to the laws.

Guidelines for Civil Hearings Involving Self-Represented Litigants explains, "[t]he parties may not communicate about the case with the judge outside formal court proceedings"; "[t]he judge, as a general rule, is prohibited from communicating with a party unless all parties are aware of the communication and have an opportunity to respond or be present"; and "[t]he parties must file all communications to the judge (complaints, motions, affidavits) with the clerk's office along with a notice that copies of those materials also have been given to the opposing party." *Guidelines for pre-hearing interaction with commentary*, Judicial Guidelines for Civil Hearings Involving Self-Represented Litigants, https://www.mass.gov/guides/judicial-guidelines-for-civil-hearings-involving-self-represented-litigants-with-commentary#1-general-practices-with-commentary (last accessed Mar. 29, 2019); *see also* Massachusetts Supreme Judicial Court Code of Judicial Conduct Rule 2.9 (governing ex parte communications), *available at* https://www.mass.gov/supreme-judicial-court-rules/canon-2-a-judge-shall-perform-the-duties-of-judicial-office#rule-2-9-ex-parte-communications. As Defendant notes, Plaintiff has not presented evidence showing Defendant interfered with Plaintiff's right to pursue his claim or continue with the litigation.[13] As a result, Defendant is entitled to summary judgment on Count IV. As noted earlier, Defendant requested "reconsideration" of the court's ruling on the motion to dismiss with respect to Count IV. The court is not reconsidering that prior ruling, which was made under the applicable standard at that earlier stage in the litigation. However, at this point in the litigation and with consideration being made under the summary judgment standard, the court now is entering summary judgment in Defendant's favor on Count IV.

---

[13] Defendant's argument that because the judge was not on the bench, Defendant could not have interfered with Plaintiff's rights is unavailing. The MCRA prohibits the attempted interference with constitutional rights. *See* G.L. c. 12, § 11H. Successful interference is not a prerequisite to liability.

## V.    DEFENDANT'S MOTION TO STRIKE

Defendant timely disclosed a use of force expert. Plaintiff did not disclose any expert until the week he filed his opposition to Defendant's summary judgment motion, which was more than a year after the deadline for expert disclosures. Plaintiff disclosed David Standen as his use of force expert and attached Standen's report to the summary judgment opposition. (Pl.'s Opp. (Dkt. No. 113) at 3-4; Pl.'s Opp. Ex. 4 (Dkt. No. 113-5).) In response to Plaintiff's late disclosure, Defendant moved for three alternative forms of relief:

- first, to strike Standen's report; or

- second, for an order (1) allowing Defendant additional time to review Standen's report, depose Standen, and potentially serve additional or alternate expert disclosures; and (2) precluding Plaintiff from augmenting Standen's report or producing a rebuttal expert; or

- third—which Defendant describes as "the most practical" option—the court can refrain from addressing the issue because Defendant is entitled to summary judgment.

(Motion to Strike (Dkt. No. 116) at 1-2). Defendant argued he had been prejudiced by the late disclosure in multiple ways, including: Plaintiff was able to decide whether to retain an expert and for what purposes after having the benefit of reviewing Defendant's expert report; Plaintiff's expert helped train Defendant's expert, and Defendant may have sought an alternative or additional expert had he known Plaintiff had retained Standen; the scheduling order allowed time for Defendant to depose Plaintiff's expert before summary judgment, and Defendant was denied that opportunity; and Defendant plans to submit a rebuttal report but is concerned such a report will result in further disclosures from Plaintiff. (*Id.* at 4-5.)

The parties subsequently submitted a joint statement concerning the motion to strike, requesting a hearing on the issue if summary judgment is denied. (Joint Statement (Dkt. No. 119) at 1.) In the statement, Plaintiff acknowledged he did not timely disclose a use of force expert (but did not explain the delay) and, at the time of the disclosure deadline (January 27, 2017), he did not

intend to retain such an expert. He argued any prejudice to Defendant can be ameliorated by amending the scheduling order to allow Defendant to depose Standen at Plaintiff's expense, to serve additional and/or alternate use of force expert disclosures, and to serve additional interrogatories concerning the nature and substance of Standen's opinions, methodology, and the factual bases of his opinions. Plaintiff also indicated he would not file a separate opposition to the motion to strike. The parties "dispute whether, if Plaintiff's expert is not struck, Plaintiff's expert may augment his report and whether Plaintiff may supplement his discovery responses as F.R.Civ.P., 26, *et seq.*, require." (*Id.* at 2.)

As Defendant's summary judgment motion is denied, the issue of remedying Plaintiff's late expert disclosure is ripe. Because the parties proposed substantially similar methods of reducing the prejudice the late disclosure caused Defendant, a hearing on the issue is unnecessary. As a result, the court substantially adopts the parties' proposals as follows:

1.  Defendant may depose Standen **at Plaintiff's expense**, serve interrogatories concerning Standen's opinion, and serve additional and/or alternate use of force expert disclosures.

2.  Defendant may also serve an expert report rebutting Standen's report.

3.  Standen shall not augment his report. However, Plaintiff must supplement his expert disclosure and/or Standen's report pursuant to Fed. R. Civ. P. 26(e)(1)(A) and 26(e)(2) **only** if he or Standen "learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to [Defendant] during the discovery process or in writing."

4.  Plaintiff shall not disclose any additional or alternative use of force expert.

The court will set a scheduling conference to amend the scheduling order to allow for this additional use of force expert discovery.

Defendant noted in his motion to strike that he has retained a medical expert, and Plaintiff may retain one. (Medical experts were not necessary for the summary judgment motion but may be

necessary for trial.) At the scheduling conference, the court will also set deadlines for disclosures of medical experts and related medical expert discovery.

## VI.    CONCLUSION

For the reasons set forth above, Defendant's motion for summary judgment (Dkt. No. 111) is GRANTED IN PART and DENIED IN PART. Specifically, Defendant's motion is granted as to Plaintiff's MCRA claim (Count IV), and the clerk is directed to enter judgment for Defendant on Count IV. Defendant's summary judgment motion is otherwise denied.[14]

Defendant's motion to strike (Dkt. No. 116) is GRANTED IN PART and DENIED IN PART.

A separate order will issue setting a scheduling conference to (1) amend the scheduling order to allow Defendant to conduct discovery related to Plaintiff's use of force expert and to submit a rebuttal report, (2) amend the scheduling order to accommodate disclosures and discovery related to medical experts, and (3) schedule the final pretrial conference and trial.


It is So Ordered.


                                                    /s/ Mark G. Mastroianni
                                                    MARK G. MASTROIANNI
                                                    United States District Judge

---

[14] Defendant moved for summary judgment on all remaining counts (Count III (42 U.S.C. § 1983), Count IV (G.L. c. 12, §§ 11H & 11I), and Count V (common law assault and battery)). Neither his opening brief nor his reply specifically addressed the assault and battery count. As a result—and because Defendant is not, at least at this stage, entitled to qualified immunity—that count survives. Thus, Counts III (42 U.S.C. § 1983) and V (assault and battery) will be tried.